**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | |
|---|---|
| Harold Miles and Debe Demple Miles, ) | Civil Action No. 4:10-00521-JMC |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| DESA Heating LLC and DHP Holdings II Corporation, ) | **OPINION AND ORDER** |
| ) | |
| Defendants. ) | |
| _____) | |

This product liability action arises out of an incident wherein Plaintiff Harold Miles ("Miles") sustained burns to approximately 30% of his body when his clothing was ignited by a DESA Heating Model HD-15G "heat Demon" propane infra-red tank-top heater (the "heater"). Miles and Debe Demple Miles ("Debe"), Miles' wife (collectively, "Plaintiffs"), filed this action against Defendants, DESA Heating LLC ("DESA") and DHP Holdings II Corporation ("DHP") (collectively, "Defendants"), alleging state law claims for negligence, strict products liability, breach of warranty, and loss of consortium. (ECF No. 5-2.)

This matter is before the court on Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (See ECF No. 53.) Plaintiffs oppose this dispositive motion asserting that issues of material fact exist precluding an award of summary judgment to Defendants. (ECF No. 59.) For the reasons set forth below, the court **GRANTS** in part and **DENIES** in part Defendants' motion for summary judgment.

      **I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

The facts as viewed in the light most favorable to Plaintiff are as follows.

1

Miles began working at the Wal-Mart Store in Lake City, South Carolina in 1993 and was working there on the date of his accident. (ECF No. 53-6, p. 7.) Miles worked as a "greeter" at the outdoor garden center at the rear entrance to the Wal-Mart store. (ECF No. 53-6, p. 8.) Miles' job required him to often work outdoors and, in the winter months, he would get cold. (ECF No. 53-6, p. 14.) Wal-Mart tried to help Miles deal with the cold by providing him access to heating devices in the winter months, including a wall-mounted electric heater. (ECF No. 53-6, pp. 14, 15.) However, Miles was never warmed to his satisfaction by these heaters. (Id.) In early December 2006, Miles complained about his heater situation to a visiting Wal-Mart executive, which official contacted the store assembler, Oscar Gamble ("Gamble"), and instructed him to bring Miles a new heater. (ECF No. 53-6, p. 10.)

Gamble picked out the heater and took it to Miles in the garden center. (Id.) The heater was manufactured for Defendants by Chant Manufacturing in November 2005. (ECF No. 59-4, p. 3.) The heater consists of a burner assembly connected to a support arm that attaches to the top of a twenty pound propane cylinder. (ECF No. 53-13, p. 2.) When the heater is "on," the burner inside the heater's burner assembly is visibly red hot. (See ECF No. 53-3, p. 2.) The heater's burner sits inside a round concave metal reflector. (See ECF No. 53-13, pp. 5-10.) A wire guard, designed to keep people and objects from coming into direct contact with the burner, is attached to the reflector. (Id.; ECF No. 53-15, p. 15.) The rear of the reflector is also enclosed by a wire assembly. (See ECF No. 53-13, pp. 5-10.)

The heater, which Gamble carried to Miles, came with an owner's manual and hang tags. (See ECF Nos. 53-13 & 53-14.) The following warnings were contained in the owner's manual:

> IMPORTANT: Read and understand this manual before assembling, starting, or servicing heater. Improper use of heater can cause serious injury. Keep this manual for future reference.

GENERAL HAZARD WARNING: Failure to comply with the precautions and instructions provided with this heater can result in death, serious bodily injury and property loss or damage from hazards of fire, explosion, burn, asphyxiation, carbon monoxide poisoning; and or electric shock.

Only persons who can understand and follow the instructions should use or service this heater . . . . (ECF No. 53-13, p. 3.)

WARNING: Fire, burn, inhalation, and explosion hazard. Keep solid combustibles, such as building materials, paper or cardboard a safe distance away from the heater as recommended by the instructions . . . . (Id. at p. 4.)

13. Maintain minimum clearance from normal combustible materials (like paper) as follows: Sides - 3 feet (0.91m); Top and Front - 5 feet (1.5m) . . . . (Id.)

17. Due to the high surface and exhaust temperatures, adults and children must observe clearances to avoid burns or clothing ignition. (Id. at p. 5.)

The hang tags affixed to the heater contained the following warning:

### WARNING

Make certain you read and understand all warnings. Do not allow anyone who has not read the owner's manual for this heater to operate this heater. Keep the owner's manual sent with this heater for reference. It is your guide to safe and proper operation of this heater. (ECF No. 53-14, p. 3.)

4. Minimum heater clearances from combustibles: Top & Front: 5 Ft., Sides: 3 Ft." (Id.)

Miles watched Gamble put the heater together and set it up. (ECF No. 53-6, p. 10.) Gamble warned Miles that he needed to stay a safe distance from the heater when the heater was on. (Id. at p. 12.) Miles allegedly began using the heater immediately after Gamble set it up, and he used it nearly every day up to the day of his accident. (ECF No. 53-1, p. 7.) Miles always used the heater inside a homemade cardboard windbreak in the garden center. (ECF No. 53-8, pp. 5, 7; ECF No. 53-4, pp. 2-4.)

On January 10, 2007, Miles reported to work on a very cold and windy day. (ECF No. 53-1, p. 10.) Miles turned on the heater, which was allegedly sitting in the rear corner of his

windbreak between the back of the Wal-Mart store and some shelving with the burner pointed at the opposite corner of the windbreak. (ECF No. 53-6, p. 27; ECF No. 53-1, p. 10.) After lighting the heater, Miles allegedly went about doing his work, returning to the windbreak periodically to warm himself when he became cold. (ECF No. 53-1, p. 10.) Sometime around 10:45 a.m., Miles allegedly entered the windbreak and turned his back toward the heater for a minute to warm up. (Id. at p. 11.) After being in the windbreak for about a minute, Miles "felt a sensation," looked down, and discovered his pants and shoes were on fire. (ECF No. 53-6, p. 23.)

When he realized his clothing was on fire, Miles allegedly ran out of the windbreak looking for someone or something to help put out the fire. (ECF No. 53-1, p. 11.) There was no one in the area, and Wal-Mart had no fire extinguisher in the garden center. (Id.) There was a hose in the area but Wal-Mart had shut it off inside the store to avoid it freezing. (Id.) Miles finally dropped and rolled near the rear entrance to the store, and several of his co-workers, seeing his dilemma, came to his aid. (Id.)

Because of his accident, Miles allegedly sustained burns to approximately 30% of his body, mostly to his back side and lower extremities. (ECF No. 59, p. 1.) As a result of the injuries he sustained, Miles allegedly spent approximately ninety days at the Joseph M. Still Burn Center in Augusta, Georgia where he had to undergo approximately eight surgical procedures, including skin grafts, and incurred approximately $1,750,000.00 in medical expenses. (Id.)

Plaintiffs filed a summons and complaint against Defendants in the Court of Common Pleas of Florence County, South Carolina on January 4, 2010. (ECF No. 5-2.) Plaintiffs claimed that Miles' accident and resulting injuries happened because the design of the heater was

defective and because the heater's warnings were inadequate. (Id.) Debe asserted a dependent loss of consortium claim arising from Miles' accident. (Id.)

On March 4, 2010, Defendants removed the case to the United States District Court for the District of South Carolina. (ECF No. 5.) DESA and DPH both filed answers denying liability to Plaintiffs on March 8, 2010. (See ECF Nos. 6 & 7.) On August 26, 2011, after the completion of discovery, Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56. (ECF No. 53.) Plaintiffs filed opposition to Defendants' motion for summary judgment on September 26, 2011, to which Defendants filed a reply in support of summary judgment on October 6, 2011. (ECF Nos. 59 & 60.)

## II.     LEGAL STANDARD AND ANALYSIS
### A.    Standard

####    1.    Summary Judgment

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denials of the movant's pleading, but instead must "set forth specific

facts" demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. See Latif v. The Community College of Baltimore, No. 08-2023, 2009 WL 4643890, at *2 (4th Cir. Dec.9, 2009).

    2.    Products Liability

Under South Carolina law, a plaintiff may bring a product liability claim under several theories, including negligence, strict liability, and warranty, as Plaintiffs have done in this case. Talkington v. Atria Reclamelucifers Fabrieken BV (Cricket BV), 152 F.3d 254, 261 (4th Cir. 1998) (stating that South Carolina appellate courts have consistently recognized this general proposition) (citations omitted). Regardless of the theory upon which the plaintiff chooses to base his cause of action, he must always establish the following elements: "(1) that he was injured by the product; (2) that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user." Talkington, 152 F.3d at 262 (quoting Bragg v. Hi-Ranger, Inc., 462 S.E.2d 321, 326 (1995)).

**B.**    **Negligence Claim**

Plaintiffs allege that Defendants were negligent in "designing, manufacturing, and selling

the subject heater . . . in failing to warn; in failing to instruct; . . . ."  (ECF No. 5-2, p. 5 ¶ 9.)

In addition to the foregoing elements consistent with any product claim, "[l]iability for negligence requires, . . . , proof that the manufacturer breached its duty to exercise reasonable care to adopt a safe design."  Allen v. Long Mfg. NC, Inc., 505 S.E.2d 354, 356(S.C. Ct. App. 1998); see also Bragg v. Hi-Ranger, 462 S.E.2d 321, 326 (S.C. Ct. App. 1996) ("[T]he plaintiff bears the additional burden of demonstrating the defendant failed to exercise due care in some respect, and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault.").  Therefore, to recover for negligence in a product liability case, a plaintiff must prove: (1) he was harmed by the product; (2) the product was in essentially the same condition as when it left the defendant; (3) the harm occurred because the product was in a defective condition unreasonably dangerous to the user; and (4) the manufacturer breached its duty to exercise reasonable care in designing the product.  Madden v. Cox, 328 S.E.2d 108, 112 (S.C. Ct. App. 1985).

In this matter, there does not appear to be any dispute regarding whether Miles was injured by the heater or whether the heater was altered from the manufacturer's original design.  Therefore, the issues remaining for this court to decide are 1) whether the heater was in "a defective condition unreasonably dangerous" to Miles, and 2) whether Defendants breached their duty of reasonable care.  Id.

    1.    <u>Defective Condition Unreasonably Dangerous</u>

Plaintiffs allege three types of defects with the heater, which defects create an unreasonably dangerous condition: (a) the heater was manufactured defectively; (b) the heater was designed defectively; and (c) and the warnings on the heater were defective.

    a. Manufacturing Defect:

To determine whether a product is unreasonably dangerous as a result of a manufacturing defect, South Carolina courts traditionally use the consumer expectations test. See <u>Branham v. Ford Motor Co.</u>, 701 S.E.2d 5, 13-14 (S.C. 2010).  This test analyzes whether the product is unreasonably dangerous to the ordinary consumer or user given the conditions and circumstances that foreseeably attend the use of the product.  <u>Bragg</u>, 462 S.E.2d at 328 (citing <u>Carter v. Massey-Ferguson, Inc.</u>, 716 F.2d 344, 347 (5th Cir. 1983)).

Defendants contend that there is no evidence of a manufacturing defect sufficient to create a jury issue.  (ECF No. 60, p. 8.)  Defendants further contend that in applying the consumer expectations test, there is no evidence in the record to support the conclusion that a consumer would reasonably expect to stand within an inch or two of the heater without risking ignition of their clothing.  (<u>Id.</u> at p. 11.)  Therefore, as a matter of law, Defendants assert that the heater was neither manufactured defectively nor was it unreasonably dangerous under the consumer expectations test.  (<u>Id.</u>)

In support of their allegations that the heater was defectively manufactured, Plaintiffs rely on the opinions of their expert, Dr. Richard W. Henderson ("Henderson"), Ph.D, who opined:

> [T]hat due to the combustion process being so efficient, consumers are not able to see the flame gases during operation of the subject heater, and therefore would not be aware of the extremely high temperatures generated by the heater, extending out to and beyond the grille.  It is also concluded that the guard (grille) was inadequate to protect against exposure to those temperature levels [of 1200 to 1300 degrees Fahrenheit within the guard and 600 degrees Fahrenheit 1 inch outside the guard].  In addition, it is concluded that there were no readily-visible notices or markings on the heater identifying the significant hazard associated with the use of the heater with respect to the extremely high temperatures extending to and beyond the grille. (ECF No. 59-1, p. 3.)

Henderson further testified that during his testing of the heater involved in this incident, he observed a flame extending about an inch beyond the heater's guard. (ECF No. 59-2, p. 5 (Tr. 43: 7-13).) In addition to the evidence provided by Henderson, Plaintiffs cite to the testimony of Bill Clemons ("Clemons"), the senior product engineer for the heater, who testified that the heater's flame was not designed to extend beyond the guard. (See ECF No. 59-10 (Tr. 40:l-41:17).) Clemons further stated that if the flame extended beyond the guard, the heater would not be in compliance with DESA's safety standards and would be a defective product. (Id.) Plaintiffs contend that Henderson's testimony and findings, in combination with the Clemons' testimony, present a question of fact regarding whether the heater was defectively manufactured and, therefore, is unreasonably dangerous.

Upon viewing the evidence of record in the light most favorable to Plaintiffs, the court finds that there is a genuine issue of material fact regarding whether the heater possessed a manufacturing defect unreasonably dangerous to Miles. Therefore, Defendants' motion for summary judgment is denied as to Plaintiffs'claim that the heater was manufactured defectively.

      b.    Design Defect:

To determine whether a product is unreasonably dangerous as a result of a design defect, the risk-utility test is traditionally used. Bragg, 462 S.E.2d at 328 (citing Carter, 716 F.2d at 347). The risk-utility test determines that a product is unreasonably dangerous and defective if the danger associated with the use of the product outweighs the utility of the product. Id. With the risk-utility test, the state of the art and industry standards are relevant to show both the reasonableness of the design and that the product is dangerous beyond the expectations of the ordinary consumer. Id. (citing Reed v. Tiffin Motor Homes, Inc., 697 F.2d 1192, 1196 (4th Cir. 1982)). In determining if a product is defective and unreasonably dangerous using the risk-

utility test, the court is required to consider factors "including the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of injury, and the obviousness of danger." Id. (citing Claytor v. Gen. Motors Corp., 286 S.E.2d 129, 132 (S.C. 1982)).  Moreover, the court must "balance the utility of the risk inherent in the design of the product with the magnitude of the risk to determine the reasonableness of the manufacturer's action in designing the product. Id.

Pursuant to the foregoing standards, Defendants assert that the heater is useful and desirable, the likelihood of an individual being injured by the heater is extremely low, and the danger of igniting one's clothing by standing too close to the heater is obvious.  (ECF No. 53-1, at pp. 24-25.)  Defendants further assert that Plaintiffs through their expert - Henderson - did not present a reasonable alternative design that would have prevented the heater from being unreasonably dangerous.  (Id. at p. 24.)  Therefore, Defendants assert that the court should find that the heater was not unreasonably dangerous as a matter of law.  (Id.)

Plaintiffs, on the other hand, contend that Defendants failed to design the heater with a guard that would ensure that individuals coming in close proximity to the heater would not be subjected to temperatures capable of instantaneously igniting clothing.  (ECF No. 59, p. 10.)  Plaintiffs further contend that the purpose of the guard is to protect persons using the heater from excessively high temperatures, but the guard designed by Defendants on the heater did not protect users from temperatures which can instantaneously ignite common clothing.  (Id. (citing ECF No. 59-1).)  As such, Plaintiffs argue that the guard on the heater should be extended farther out from the burner to ensure that the temperatures at the guard are not sufficient to ignite clothing and other materials.  (Id.)  Plaintiffs further argue that they provided a feasible alternative design through Henderson's extended guard, which guard would not be more

expensive than the original design. (Id. (citing ECF Nos. 53-20 & 21; ECF No. 59-4, p. 8).)

After considering the testimony and evidence in the light most favorable to Plaintiffs, the courts finds that the question of whether Defendants' design was defective is an issue of fact for the jury. Therefore, Defendants' motion for summary judgment is denied as to Plaintiffs' claim that the heater was designed defectively.

   c. Warning Defects

The seller of a product may be required to give a warning on the product concerning its use in order to prevent a product from being unreasonably dangerous. Restatement (Second) of Torts § 402A cmt. J, at 353 (1965). However, under South Carolina law, a seller is not required to warn of dangers or potential dangers that are generally known and recognized. Anderson v. Green Bull, Inc., 268 S.E.2d 708, 710 (S.C. Ct. App. 1996); see also Dema v. Shore Enter., Ltd., 435 S.E.2d 875, 876 (S.C. Ct. App. 1993) ("A product is not defective for failure to warn of the obvious.").

Plaintiffs contend that their failure to warn claim presents a question of fact as to whether Defendants' warnings were adequate. (ECF No. 59, pp. 12-13.)

The court finds that even without written warnings, users of the heater would be aware, as a matter of common sense, that they should be careful around a heater. Because it is obvious that a heater can cause injury to someone who stands too close to it, Defendants did not have a duty to warn users of the heater of that risk. Therefore, Defendants are entitled to summary judgment as to Plaintiffs' claim that the heater contained defective warnings.

  2. <u>Breach of Duty of Reasonable Care</u>

For Plaintiffs to establish Defendants' liability under a negligence theory, Plaintiffs must show that Defendants breached a duty of care to make the heater safer. The court finds that

because the evidence of record, in the light most favorable to Plaintiffs, supports the conclusion that the heater possessed manufacturing and/or design defects unreasonably dangerous, Defendants had a duty of care regarding the type of guard that was attached to the heater, and whether Defendants breached that duty of care is a question of fact that must be decided by a jury. See Dorrell v. S.C. Dep't of Transp., 605 S.E.2d 12, 18 (S.C. 2004). Moreover, it is for a jury to decide whether Miles' injury was foreseeable. Id.

### C.    Strict Products Liability Claim

Plaintiffs allege that Defendants sold the heater "in an unreasonably dangerous and defective condition and as a result are strictly liable for Plaintiffs' injuries and damages." (ECF No. 5-2, p. 6 ¶ 12.)

The theory of strict liability is premised on the concept that the cost of injuries resulting from defective products should be borne by the manufacturer or seller who puts such products on the market rather than by the ultimate uses who are injured by the product and powerless to protect themselves. Fleming v. Borden, Inc., 450 S.E.2d 589, 592 (S.C. 1994). In order to recover under a strict liability theory, the plaintiff must establish that: (1) the defendant's product was in a defective condition unreasonably dangerous for its intended use; (2) the defect existed when the product left the defendant's control; and (3) the defect was the proximate cause of the injury sustained. Livingston v. Noland Corp., 362 S.E.2d 16, 18 (S.C. 1987); Madden, 328 S.E.2d at 112.

Defendants' argument that it is entitled to summary judgment on Plaintiffs' strict liability claim is essentially the same as its argument for summary judgment on Plaintiffs' negligence claim: Plaintiffs have failed to provide evidence of a defective condition unreasonably dangerous and proximate cause. As discussed above, the court has found the existence of

questions of fact regarding the existence of design and/or manufacturing defects in the heater and whether those defects caused Miles' injuries. The court must therefore deny Defendants' motion for summary judgment as to Plaintiffs' strict liability claim based on the arguments presented.

### D.  Breach of Warranty Claim

Plaintiffs allege that Defendants "breach[ed] implied and express warranties in the sale of the heater in an unreasonably dangerous and defective condition." (ECF No. 5-2, p. 6 ¶ 14.)

Generally, the failure of a product to work as expected or represented is sufficient to give rise to an inference of breach of warranty. Southeastern PVC Pipe Mfg. v. Rothrock Constr. Co., 313 S.E.2d 50, 52 (S.C. 1984); Simmons v. CIBA-GEIGY Corp., 302 S.E.2d 17, 18 (S.C. 1983). The South Carolina Commercial Code establishes three types of warranty: (1) implied warranty of merchantability[1]; (2) implied warranty of fitness for a particular purpose[2]; and (3) an express warranty.[3] In an action based on warranty, plaintiff's case is complete when he has proved the product, as designed, was in a defective condition unreasonably dangerous to the user when it left the control of the defendant, and the defect caused his injuries. Madden, 328 S.E.2d at 112

---

[1]  "Unless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." S.C. Code Ann. § 36–2–314(1). South Carolina law sets forth several requirements that must be met for goods to be merchantable. See S.C. Code Ann. § 36–2–314(2). For purposes of Plaintiffs' claim, the only requirement relevant is that the goods, to be merchantable, "are fit for the ordinary purposes for which such goods are used." Id.

[2]  In South Carolina, an implied warranty of fitness for a particular purpose arises if "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods . . . ." S.C. Code Ann. § 36–2–315. If "the particular purpose for which a product is purchased is also the ordinary or intended purpose of the product, the warranties of merchantability and of fitness for a particular purpose merge and are cumulative, such that a plaintiff may proceed upon either theory." Soaper v. Hope Indus., 424 S.E.2d 493, 495 (S.C. 1992) (holding that plaintiff, who purchased film processing machine, "impliedly made known to [defendant] that his particular purpose for the machine was fast film processing" and that "[w]hen the machine failed in that purpose, it was both unmerchantable and unfit for its particular purpose").

[3]  In South Carolina, a seller may create an express warranty in a number of ways, including "[a]ny affirmation of fact or promise, . . . made by the seller to the buyer, whether directly or indirectly, which relates to the goods and becomes part of the basis of the bargain." S.C. Code Ann. § 36–2–313(1). In addition, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Id. In order to establish a cause of action for breach of an express warranty, a plaintiff must show "the existence of the warranty, its breach by the failure of the goods to conform to the warranted description, and damages proximately caused by the breach." First State Sav. & Loan v. Phelps, 385 S.E.2d 821, 825 (S.C. 1989).

(citing S.C. Code Ann. § 15-73-10).

The court finds that since the evidence of record was sufficient to sustain the action for strict product liability, it naturally follows that the action based on warranty should survive summary judgment. See Livingston v. Noland Corp., 362 S.E.2d 16, 18 (S.C. 1987) (warranty is similar to strict liability in that both require proof that the product was not reasonably fit or safe for its intended use). Accordingly, Defendants' motion for summary judgment as to Plaintiffs' claim for breach of warranty is hereby denied.

### E.     Loss of Consortium Claim

Plaintiff alleges that Debe, "due to the injuries suffered by [Miles] her husband, has been made to endure the loss of her consortium, support and care." (ECF No. 5-2, p. 5 ¶ 7.)

A loss of consortium claim is a distinct, independent cause of action. Preer v. Mims, 476 S.E.2d 472, 474 (S.C. 1996). In order to prevail in an action for loss of consortium, a plaintiff must prove the defendant's liability for the spouse's injuries, as well as damages to the plaintiff resulting from the spouse's injury. Creighton v. Coligny Plaza Ltd. P'ship, 512 S.E.2d 510, 523 (S.C. Ct. App. 1998). The claim cannot arise if no tort has been committed by defendant against the impaired spouse. Id.

Defendants did not specifically move for summary judgment on Debe's claim for loss of consortium because the success of the consortium claim depends on the success of Miles' other claims. See Sheppard v. CSX Transp., Inc., C/A No. 01–4312, 2002 WL 34378297, at *14 (D.S.C. Nov. 8, 2002) (finding that wife's claims were "solely for loss of consortium and, therefore, entirely dependant upon her husband having a viable claim against Defendant"). Because Miles' claims survived summary judgment in great part, the court finds that an award of summary judgment to Defendants on Debe's loss of consortium claim should not be granted.

**F.    Punitive Damages**

In South Carolina, punitive damages are awarded to plaintiff as a matter of right where reckless or willful conduct has been proven. Sample v. Gulf Ref. Co., 191 S.E. 209, 214 (S.C. 1937); see also Hardy v. Int'l Paper Realty Corp., 716 F.2d 1044, 1047 (4th Cir. 1983).

Defendants assert that they are entitled to summary judgment on the issue of punitive damages. This argument largely incorporates Defendants' claim that they were not negligent. The court finds that there is sufficient evidence in the record, when viewed in the light most favorable to Plaintiffs, which establishes the existence of genuine issues of material fact as to Plaintiffs' claim for punitive damages. Therefore, the court denies Defendants' motion for summary judgment as to punitive damages.

### III.    CONCLUSION

Upon careful consideration of the entire record, the court hereby **DENIES** the motion for summary judgment of Defendants, DESA Heating LLC and DHP Holdings II Corporation, regarding Plaintiffs' claims for manufacturing defect and/or design defect in relation to the causes of action for negligence, strict products liability, and breach of warranty. (ECF No. 53.) The court further **DENIES** Defendants' motion for summary judgment as to Plaintiffs' claims for loss of consortium and punitive damages. (Id.) The court **GRANTS** Defendants' motion for summary judgment in regards to Plaintiffs' claim for failure to warn and/or instruct in relation to the causes of action for negligence, strict products liability, and breach of warranty. (Id.)

**IT IS SO ORDERED**.

*J. Michelle Childs*

J. MICHELLE CHILDS
UNITED STATES DISTRICT JUDGE

March 27, 2012
Columbia, South Carolina